[No. 13174.  *En Banc.*  June 19, 1917.]

## S. LOUISE ACKERSON, *Appellant*, v. J. S. ELLIOTT *et al.,* *Respondents.*[1]

TRUSTS—CONSTRUCTIVE TRUST—PRINCIPAL AND AGENT—SECRET PUR-
CHASE BY AGENT.  Although an agent was employed primarily to
care for and rent property, a constructive trust arises in favor of
the principal who, on the advice of her agent, sold property to a
third person secretly acting for the agent, where it appears that the
principal, a nonresident owner unacquainted with the property, re-
lied upon the advice of the agent after he had invited and obtained
her trust and confidence.

LIMITATION OF ACTIONS—RELIEF ON THE GROUND OF FRAUD—CON-
STRUCTIVE TRUSTS—DISCOVERY OF FRAUD.  A constructive trust in
favor of a principal for land secretly acquired by the agent con-
tinues until discovery of the circumstances giving rise to the trust;
and action therefor is not barred until three years thereafter, under
Rem. Code, 159, relating to actions for relief upon the ground of
fraud.

TRUSTS—CONSTRUCTIVE TRUST—NOTICE OF FRAUD—LACHES.  A prin-
cipal is not guilty of laches in failing to discover that her agent
had secretly obtained title to land which he had advised her to sell,
from the fact that her attorney learned of the fact three years later,
where the agent was under obligation to inform her that he ac-
quired the land for himself.

SAME.  Since the recording of an instrument is notice only to
subsequent purchasers, the recording of a deed to an agent, holding
under a constructive trust for his principal, is not constructive notice
of the fraud whereby the agent induced the principal to sell the land
to a third person for his secret benefit.

SAME—CONSTRUCTIVE TRUST—REPUDIATION.  Adverse and open
possession by an agent, who fraudulently obtained title to the land
of his principal, is not a repudiation of the constructive trust, where
the principal had no knowledge of the fraud or existence of the
trust.

FULLERTON, J., dissents.

Appeal from a judgment of the superior court for King
county, Dykeman, J., entered September 25, 1915, in favor

[1]Reported in 165 Pac. 899.

of the defendants, in an action for equitable relief, tried to
the court.   Reversed.

*John W. Roberts, Arthur E. Nafe,* and *Dwight L. Hart-
man,* for appellant.

*James B. Murphy* and *James B. Bruen,* for respondents.

PARKER, J.—This action was commenced in the superior
court for King county by Mrs. S. Louise Ackerson against
J. S. Elliott and wife, seeking recovery and reconveyance to
her of a fifty-acre tract of land in that county near Seattle,
which she claims was acquired from her by J. S. Elliott un-
der such circumstances as to constitute him a trustee holding
the title thereto in trust for her, and also seeking an account-
ing for the rents and profits of the land.   After the com-
mencement of the action and the filing of the answer, verified
by J. S. Elliott in person, he died, leaving his wife surviving
him, who thereupon became the executrix of his estate, and
thereafter she, as executrix, being substituted as defendant,
the case proceeded to trial and judgment against plaintiff
denying the relief prayed for by her, from which she has ap-
pealed to this court.

In the year 1899, Mrs. Ackerson was the owner of the tract
of land in question and other real property in King county.
In that year she placed all of her property in King county in
the hands of J. S. Elliott, as her agent for the purpose of
caring for and renting the same.   It does not appear that
he was then given authority to find purchasers for any of the
property, though he did thereafter find purchasers for some
of it to whom sales were made by Mrs. Ackerson, she recog-
nizing Elliott's services in that behalf and paying him com-
pensation therefor measured by commissions upon the selling
prices.   The evidence indicates quite clearly that, while Elliott
was primarily employed by Mrs. Ackerson merely as her
renting agent, she came to depend upon him in some measure
for information and advice concerning conditions in Seattle
and vicinity affecting her property there, not only as to its

earnings, but as to the possibility of its sale.  She even advised with him to some extent in relation to the purchase of other property in Seattle.  Numerous letters passed between them in which conditions touching her property interests in Seattle and vicinity were discussed at considerable length by each of them.  She has been, at all times since prior to the year 1899, a nonresident of this state, and was unacquainted with the tract of land in question and its value.

As showing the nature of the relation of confidence which had grown up between them, we here notice portions of some of the letters passing between them.  On January 8, 1901, Elliott wrote to Mrs. Ackerson a somewhat lengthy letter advising her of conditions in and about Seattle, as the same affected her property interests there, accompanying the letter with copies of Seattle newspapers, stating that he sent her these copies to advise her of the progress the city was making.  In this letter he had considerable to say as to the advisability of her selling some of her property and also improving some of it, not mentioning the property here in question, however.  On February 13, 1901, she answered this letter, evidently appreciating the information it gave her, referring to it as "your good long letter of January 8."  In this answering letter she said to him, "I shall be glad to keep in communication with you and to be advised by you."  And further, on referring to the possibility of a sale of certain of her property, she said, "If you have what you consider a good offer for it, submit it to me and I will lose no time in replying.  I depend upon *your* advice above all others."  On December 24, 1901, in a letter to Elliott, Mrs. Ackerson said, "I am remembering old friends and sending the season's greetings.  I want to express to you my best wishes."  Then, after mentioning matters touching the value of and possibility of a sale of certain of her property, she said, "I have such confidence in your judgment I would value your opinion if you would favor me with it as in the past."  These expressions

on the part of Mrs. Ackerson manifestly were prompted by numerous and lengthy letters written to her by Elliott relating to her property interests in King county apart from the mere renting of her property. Such was the relationship existing between them and which continued up until a short time following the occurrence of the acts complained of by Mrs. Ackerson here involved, which resulted in Elliott acquiring this land from her. His agency for her ceased a short time thereafter because of the fact that all her property there had been sold, the sale to Sanderson for Elliott of this land being among the last.

Since about the year 1901, M. F. Backus, of Seattle, has represented Mrs. Ackerson as her banker in Seattle, to whom the rents collected by Elliott were turned over by him and to whom interest and mortgage loans due to Mrs. Ackerson were paid by those owing her in Seattle. Since prior to the year 1899, John P. Hartman has been attorney for Mrs. Ackerson in all her affairs requiring the services of an attorney in Seattle. Neither Backus nor Hartman has been her real estate agent for the purpose of finding purchasers of her property, neither of them being engaged in the real estate business, though they advised her to some extent touching the sale of her property there from time to time.

In January, 1903, the land in question being still in Elliott's hands as agent for the purpose of renting the same, and the relation between him and Mrs. Ackerson touching her property interests in King county being as above noticed by us, he secretly caused one Sanderson to purchase the land for him from Mrs. Ackerson for $7,500, he furnishing to Sanderson the money therefor, a deed from Mrs. Ackerson to Sanderson being executed January 29, 1903, and a deed from Sanderson to Elliott being executed in consummation of the deal on March 2, 1903, both of these deeds being recorded in the auditor's office of King county on March 12, 1903. Sanderson, at the instance of Elliott, went to Hartman and offered $7,500 for the land, Hartman not knowing the rela-

tion existing between Elliott and Sanderson. Hartman was unacquainted with the land and did not know its value. He communicated this offer to Elliott, asking Elliott's advice as to whether or not he, Hartman, should advise Mrs. Ackerson to accept the offer. Elliott advised Hartman that it was a good offer and all that the land was worth, and that he thought Mrs. Ackerson should be advised to accept it. Hartman and Backus considered the matter, both being unacquainted with the value of the land and both depending upon the advice of Elliott as to its value. They concluded to advise Mrs. Ackerson to accept the offer made by Sanderson. Hartman so wrote Mrs. Ackerson, enclosing a deed for her to execute in the event she accepted the offer. She thereupon concluded to accept the offer, executed the deed and returned the same to Hartman, who delivered it to Sanderson upon the payment of the purchase price agreed upon. This was all done without any knowledge whatever upon the part of Mrs. Ackerson, Hartman or Backus that Elliott was in fact the purchaser of the land.

A short time prior to this secret purchasing of the land by Elliott, he had been offered $10,000 for the land. The evidence, we think, shows that the land was in fact then worth more than $7,500, that Elliott knew it was worth more, and that that fact prompted him to thus purchase it secretly. Except as to a small portion of the land, Elliott has been in possession of it by his tenants at all times since he acquired it through Sanderson from Mrs. Ackerson in 1903. For this small portion he received $12,606 as the result of a condemnation proceeding several years after so acquiring the land. He also received additional sums for rent collected since 1903, and also a small sum for cedar shingle bolts sold from the land. Deducting the purchase price of $7,500 paid by him through Sanderson to Mrs. Ackerson for the land in 1903, and taxes and other moneys expended by him which it is conceded he is in any event entitled to credit for as against the land and Mrs. Ackerson's claim thereto, he received $1,136.48

more than he expended up until April 6, 1915, the date of verifying his answer in this case. Neither Mrs. Ackerson, Hartman or Backus knew that Elliott had secretly purchased the land through Sanderson in 1903 until shortly before the commencement of this action in January, 1915. There is evidence in the record indicating that both Hartman and Backus learned, possibly as early as the year 1906, that Elliott had become the owner of the land, but the evidence, we think, renders it certain that neither of them had knowledge of the manner in which Elliott became such owner until shortly before the commencement of this action. The evidence, we think, also renders it certain that Mrs. Ackerson did not learn either of Elliott's ownership of the land or of the manner of his acquiring the land until shortly before the commencement of this action.

Counsel for Mrs. Ackerson contend that Elliott's agency with reference to the land in question was such that he could not lawfully secretly purchase the land through Sanderson from her, and that when he did so purchase it he acquired it and held it in trust for her, if she should timely make election to have the sale so treated. Counsel for Elliott apparently concede that such would be the law of the case if Elliott's agency had been one to sell the land for Mrs. Ackerson, but insist that Elliott's agency was only to rent the land for her, and that, his agency being so limited, he was as free to purchase it from her in the manner he did as any stranger would be. We have not had called to our attention any decision of the courts dealing with the claimed right of a mere renting agent to secretly purchase the property of his principal which is in his charge as such agent. It seems to us, however, that the good faith and loyalty due from Elliott to Mrs. Ackerson, growing out of his relation to her and existing at the time of the purchase of the land by him through Sanderson, though at the beginning of his agency he was nothing more than a mere renting agent, forbade him from secretly acquiring any interest in the land. The trust and

confidence he invited her to repose in him, and which she did repose in him, became such that she had a right to rely upon his acting with reference to this land, as well as her other property in King county, wholly in her interest uninfluenced by any interest of his own. It seems to us that the rights of Mrs. Ackerson as against Elliott and his estate are governed by the principles so well stated in 1 Story's Equity Jurisprudence (13th ed.), § 308, as follows:

"It is undoubtedly true, as has been said, that it is not upon the feelings which a delicate and honorable man must experience, nor upon any notion of discretion to prevent a voluntary gift or other act of a man whereby he strips himself of his property, that Courts of Equity have deemed themselves at liberty to interpose in cases of this sort. They do not sit, or affect to sit, in judgment upon cases as *custodes morum*, enforcing the strict rules of morality. But they do sit to enforce what has not inaptly been called a technical morality. If confidence is reposed, it must be faithfully acted upon, and preserved from any intermixture of imposition. If influence is acquired, it must be kept free from the taint of selfish interests, and cunning and overreaching bargains. If the means of personal control are given, they must be always restrained to purposes of good faith and personal good. Courts of Equity will not therefore arrest or set aside an act or contract merely because a man of more honor would not have entered into it. There must be some relation between the parties which compels the one to make a full discovery to the other or to abstain from all selfish projects. But when such a relation does exist, Courts of Equity, acting upon this superinduced ground in aid of general morals, will not suffer one party, standing in a situation of which he can avail himself against the other, to derive advantage from that circumstance; for it is founded in a breach of confidence. The general principle which governs in all cases of this sort is, that if a confidence is reposed and that confidence is abused, Courts of Equity will grant relief."

In *McNutt v. Dix*, 83 Mich. 328, 47 N. W. 212, 10 L. R. A. 660, we have a striking illustration of how one inviting trust and confidence in himself was held accountable to the one he volunteered to serve, though he apparently acted in

the best of faith in acquiring the property from the owner
whom he was assuming to serve. Dix was the administrator
of an estate. Looking to the settlement of the estate, one
Hastings contemplated buying up the interests of the heirs.
Mrs. McNutt, one of the heirs, was advised by Dix, by letter,
to sell her interest for $450, apparently a fair price, send-
ing her a deed for execution should she decide to sell. This
was done by Dix as a means of prompt and economic settle-
ment of the estate and without any notion of acquiring the
interest himself or for profit to himself. The deed was exe-
cuted by Mrs. McNutt, leaving a blank space for the name
of the grantee, specifying $450 as the consideration, and
forwarded to Dix. He then tried to get Hastings to accept
the conveyance and pay the $450. This Hastings did not do,
claiming he was then unable to do so. Later Dix inserted his
wife's name in the deed and sent $450, the agreed purchase
price, to Mrs. McNutt. Later Dix sold the interest to
Hastings for $600. The action was to recover the $150
excess received by Dix, upon the theory that he was ac-
countable therefor to Mrs. McNutt as her trustee. Dispos-
ing of the contention made in behalf of Dix that he was at
liberty to so acquire the interest of Mrs. McNutt under the
circumstances shown, the court said:

"There is some force in the position taken by defendant,
under the particular circumstances of this case; but there
are certain legal principles which stand in the way of his being
permitted to keep the money received by him on the sale of
this property, if he had undertaken to act for the plaintiff
as her agent in making this sale. The law is very strict in
scrutinizing the conduct of those who are acting in a fidu-
ciary relation.

"In *Moore v. Mandlebaum*, 8 Mich. 441, this court, in
speaking of one who had assumed to act as the agent of an-
other, said: 'In that confidential relation he was bound to
the utmost degree of good faith, and had no right, while pro-
fessing to act in that capacity, to make himself the agent of
other parties for the purchase of the land he was authorized
by the plaintiff to sell, nor to take any advantage of the con-

fidence his position inspired to obtain the title himself.  Nor could he make a valid purchase from his principal while that confidential relation existed without fully and fairly disclosing to his principal all the propositions he had received, and all the facts and circumstances within his knowledge, in any way calculated to enable his principal to judge of the propriety of such sale.' "

It is true, it may be said that Elliott was not assuming to act for Mrs. Ackerson in the sale of this land, but we think that the trust and confidence which he had invited Mrs. Ackerson to repose in him touching all her property interests in King county became such that he could not secretly acquire an interest in any of her property there without violating that trust and confidence.

. In *Gardner v. Ogden*, 22 N. Y. 327, 78 Am. Dec. 192, the subject of an agent acquiring secretly an interest in the property of his principal to which the agency relates is learnedly reviewed at length, the court holding that a clerk of a broker employed to make sale of land, who has access to the correspondence between his principal and the vendor, stands in such a relation of confidence to the vendor that if he becomes the purchaser he is chargeable as trustee for the vendor and must reconvey or account for the value of the land.

The following authorities lend support to our conclusion: *Trice v. Comstock*, 121 Fed. 620, 61 L. R. A. 176; *Hindle v. Holcomb*, 34 Wash. 336, 75 Pac. 873; *Carson v. Fogg*, 34 Wash. 448, 76 Pac. 112; *Landis v. Wintermute*, 40 Wash. 673, 82 Pac. 100; *Easterly v. Mills*, 54 Wash. 356, 103 Pac. 475, 28 L. R. A. (N. S.) 952; 31 Cyc. 1444.  We are of the opinion that, in acquiring title to the land, Elliott received and held it in trust for Mrs. Ackerson, which trust would continue until such time as she would learn of the circumstances under which he acquired it, and such further time as she would be permitted by law to disaffirm the sale.

It is further contended in behalf of Mrs. Elliott that the action is barred by the statute of limitations, and that she

and her husband had acquired title to the land before the commencement of this action by adverse possession. Being of the opinion that the land was acquired in trust for Mrs. Ackerson, we think it follows that the statute would not run against her so long as that trust relation existed. While this is an action on her part to recover the land, it is, in substance, an action for relief upon the ground of fraud, and, as we have already noticed, Mrs. Ackerson did not discover the fraud, to wit, Elliott's manner of acquiring title to the land, until very near the time of the commencement of this action. It seems plain, therefore, that she is not barred by the statute of limitations, since less than three years expired after her discovery of the fraud. Rem. Code, § 159.

In this connection it is further contended that Mrs. Ackerson has been guilty of laches. This seems to be rested upon the theory that some three years following the acquisition of the land by Elliott, Hartman and Backus, Mrs. Ackerson's attorney and banker in Seattle, knew that he had become the owner of the land. We have already noticed that their knowledge was nothing more than this, and did not go so far as to amount to knowledge of the manner in which he had acquired title to the land nor as to when he acquired title to the land. If Elliott had been under no obligation to inform Mrs. Ackerson himself that he was purchasing the land for himself there might be some room for argument of counsel in his behalf that the knowledge acquired by Backus and Hartman should be imputed to Mrs. Ackerson, but in view of Elliott's duty in this respect, we think that neither he nor his wife, as his successor in interest, can base any claim upon the knowledge so acquired by Backus or Hartman, even if we should concede that their knowledge was of the manner in which Elliott had acquired the title instead of the mere fact that he had acquired the title.

Some contention is made that the recording of the deeds from Mrs. Ackerson to Sanderson and from Sanderson to Elliott in March, 1903, was notice to Mrs. Ackerson, Hart-

man and Backus. Plainly this is not so, since it seems to be
well settled law that the recording of an instrument is only
constructive notice to those acquiring interests subsequent to
the execution of the instrument. There was nothing prompt-
ing either Mrs. Ackerson, Hartman or Backus to look to the
public records to discover the fraud practiced upon Mrs.
Ackerson, of which they had no suspicion until very shortly
prior to the commencing of this action. *Maurer v. Reif-
schneider*, 89 Neb. 673, 132 N. W. 197, Ann. Cas. 1912C
643. Our decision in *Johnstone v. Peyton*, 59 Wash. 436, 110
Pac. 7, is in harmony with this view, though that involved
the placing upon record a judgment which had been fraud-
ulently obtained by default. It was there held that the de-
fendant, having no actual knowledge of the rendering of
judgment against him, was not bound by the record thereof
as notice.

It is further suggested that there was an open repudiation
of the trust by the adverse possession of Elliott during the
twelve years following the acquiring of the title by him. We
may concede that his possession was so open and plain as to
advise all persons that he was claiming title to the land, but
this was no evidence to any one that he had acquired the
property fraudulently in violation of his duty to Mrs. Ack-
erson in 1903. Had she been advised of Elliott's manner of
acquiring the land, which gave rise to the trust in her favor,
and failed to make timely claim to the land after discovery
thereof, this so-called repudiation of the trust by Elliott and
holding of possession during these years might have defeated
Mrs. Ackerson's claim here made, but any repudiation of the
trust to be available against Mrs. Ackerson must have been
such as advised her of the existence of the trust as well as of
its repudiation, under the circumstances of this case.

We conclude that the judgment must be reversed and Mrs.
Ackerson awarded the land, and that the Elliott estate is
bound to account to her for all sums received by Elliott from
the sale of a portion of the land through condemnation pro-

ceedings, rent collected and shingle bolts sold therefrom, less the moneys paid out by him to Mrs. Ackerson through Sanderson as the purchase price of the land, and moneys paid out by him for taxes and other expenses in connection with his holding the land. This, as we have noticed, left a balance due Mrs. Ackerson, at the time of the commencement of this action, of $1,136.48, the amount of which is conceded to be correct by counsel for Mrs. Elliott. Indeed, this result is arrived at from Elliott's own statement of the moneys received and paid out by him, attached to his answer.

The case is remanded to the superior court with directions to enter a decree in favor of Mrs. Ackerson, quieting her title to the land and directing its reconveyance to her by a commissioner. The superior court is also directed to render a judgment in favor of Mrs. Ackerson against the estate of J. S. Elliott, deceased, to be paid in the due course of administration, for the sum of $1,136.48, or in the event additional sums have been paid out by Elliott or Mrs. Elliott, as executrix, for taxes upon the land or other proper expenses in connection therewith, and additional rents and profits have been derived by them from the land since the commencement of this action, then the superior court is directed to take an accounting thereof and render judgment for the sum so found to be due Mrs. Ackerson.

Mount, Holcomb, Chadwick, Morris, and Webster, JJ., concur.

Fullerton, J. (dissenting)—I think the facts of this case justify an affirmance of the judgment below. I therefore dissent from the conclusion of the majority.

Ellis, C. J., and Main, J., took no part.